**Electronically Filed
Intermediate Court of Appeals
29727
31-JAN-2013
08:20 AM**

NOS. 29727 and 29728

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

IN THE MATTER OF THE THOMAS H. GENTRY REVOCABLE TRUST

and

IN THE MATTER OF T.H.G. MARITAL TRUSTS

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(T. NOS. 02-1-0030 (EEH) and 06-1-0044(EEH))

MEMORANDUM OPINION
(By: Foley, Presiding Judge, Leonard, J., and
Circuit Judge Crandall, in place of Nakamura, C.J.,
and Fujise, J., all recused)

In this consolidated appeal, beneficiaries of the
Thomas H. Gentry Revocable Trust and Marital Trust appeal from
February 27, 2009 judgments of the Circuit Court of the First
Circuit (**Circuit Court**) filed in two related matters: In re
T.H.G. Marital Trusts, TR 06-1-0044 (**Marital Trust**), and In re
Thomas H. Gentry Revocable Trust, TR 02-1-0030 (**Revocable Trust**).
The Marital Trust appeal challenges the following orders and
judgments, both filed on February 27, 2009: (1) Order Approving
Sonnenschein Nath & Rosenthal LLP Fees as Set Forth in Co-
Trustees' Petition for Income and Principal Accounts for the
Period January 1, 2007 through December 31, 2007, Filed June 12,
2008; and (2) Judgment Regarding Order Approving Sonnenschein
Nath & Rosenthal LLP Fees as set Forth in Co-Trustees' Petition

for Approval of Income and Principal Accounts for the Period January 1, 2007 through December 31, 2007, Filed on June 12, 2008.[1/]  The Revocable Trust appeal challenges the following, also filed on February 27, 2009:  (1) Order Granting in Part and Continuing in Part Co-Trustees' Petition for Approval of Income and Principal Accounts for the Period January 1, 2007 through December 31, 2007, Filed on June 12, 2008; and (2) Judgment Regarding Order Granting in Part and Continuing in Part Co-Trustees' Petition for Approval of Income and Principal Accounts for the Period January 1, 2007 through December 31, 2007, Filed on June 12, 2008.  The judgments in both matters were certified for appeal in accordance with Hawaiʻi Probate Rules (**HPR**) Rule 34(b) and Hawaiʻi Rules of Civil Procedure (**HRCP**) Rule 54(b).

The appealed orders and judgments collectively approved the trusts' 2007 accounts with respect to the payment of attorneys' fees totaling approximately $1.1 million from the two Gentry trusts to a California law firm, Sonnenschein Nath & Rosenthal LLP (**SNR**).  Petitioners-Appellees Mark L. Vorsatz and First Hawaiian Bank (collectively, **Trustees**) incurred the fees in 2007 during the course of administering the trust, including litigation concerning several years of trust accounts.

The appealing beneficiaries (collectively, **Beneficiaries**) are Diane "Kiana" Gentry (**Kiana**), the settlor's wife; Norman, Tania, and Mark Gentry, his children from a prior marriage; and Scott A. Makuakane, guardian ad litem for unborn, contingent beneficiaries.  They argue that the Circuit Court erred in approving the accounts with respect to the payments of attorneys' fees from the trusts to SNR, contending that the fees were unreasonable, excessive, and not incurred for the benefit of the trusts.  They also challenge SNR's billing invoices as a basis for the fees, arguing that the invoices reflect prohibited

---

[1/]    The Honorable Elizabeth Eden Hifo presided in both matters.

2

billing practices such as block billing, double billing, and non-compensable administrative work. We conclude that the Circuit Court did not abuse its discretion in approving the trusts' 2007 accounts, including the payment of the trustees' attorneys' fees as reasonable, necessary, and beneficial to the trusts.

I.    BACKGROUND

This consolidated appeal concerns the reasonableness of trustees' payment of approximately $1.1 million to SNR for attorneys' fees and costs incurred in 2007. These fees were incurred during the course of trust administration, including litigation of several years of contested trust accountings. To understand the context in which the fees were incurred, it is necessary to briefly examine the history of the trusts' administration and the litigation that culminated in two settlement agreements in August and December of 2007.

Thomas H. Gentry (**Mr. Gentry**), a prominent Hawaiʻi real estate developer, died in 1998 after a catastrophic boating accident left him comatose for more than three years. His assets passed to his family primarily in two trusts, the Revocable Trust and a Marital Trust.

At the time of Mr. Gentry's accident, his assets were largely held in the Revocable Trust. Mr. Gentry executed the Revocable Trust in 1986 and restated it in 1992. Pursuant to the terms of the Revocable Trust, Mr. Gentry's long-time business associate, Mark L. Vorsatz (**Vorsatz**), was appointed as a trustee, together with a corporate trustee, Hawaiian Trust Company. After Hawaiian Trust Company indicated it would no longer be willing to serve as a trustee, First Hawaiian Bank was appointed to serve as a co-trustee, with Vorsatz, for both trusts. The terms of the Revocable Trust provided also that "[t]his instrument shall be construed and administered in accordance with the laws of the State of California."

The Revocable Trust terms provided for the creation of several subtrusts upon Mr. Gentry's death. After Mr. Gentry

became incapacitated in 1994, the court gave effect to the Marital Trust.  Its purpose was to provide for Kiana during Mr. Gentry's incapacity and after his death.  Like the Revocable Trust, the Marital Trust directed that it be administered according to California law.

At the time of Mr. Gentry's accident, the trust assets, and particularly the Gentry Companies, faced significant financial difficulties.  The Gentry Companies were saddled with nearly $300 million of indebtedness to third-party lenders; the Gentry Companies' assets and Mr. Gentry's personal assets were collateralized and cross-collateralized to secure the outstanding debt; the Gentry Companies carried over $100 million of inter-company indebtedness; and financial predictions for the Gentry Companies anticipated annual negative cash flow of $45 million. The Trustees exerted significant efforts to steer the trust assets toward financial stability.  By 2007, the trusts were estimated to have a net worth over $100 million.

A.    Early Administration of Trusts

1.    Revocable Trust

On March 27, 2002, the Trustees filed a Petition for Approval of Income and Principal Accounts for the Period January 16, 1998 through December 31, 1999.  Kiana filed objections alleging that the Trustees breached their fiduciary duties by: (1) failing to properly establish and fund the subtrusts; (2) failing to provide sufficient information regarding allocation of legal fees; and (3) failing to provide sufficient information to render clear and accurate accounts.  Several other beneficiaries filed limited objections concerning the subtrusts.  The Circuit Court approved, in part, the 1998-99 accounting, but deferred resolution of issues regarding funding of the subtrusts.  Twelve issues regarding Kiana's objections to the 1998-99 accounting remained unresolved until 2007.

On October 1, 2004, the Trustees filed a Petition for Approval of Income and Principal Accounts for the Period January

1, 2000 through December 31, 2003. Kiana filed objections to the petition, arguing that the Trustees breached their fiduciary duties by: (1) failing to establish and fund the subtrusts in accordance with the Revocable Trust's terms; (2) failing to provide sufficient information to render clear and accurate accounts; (3) failing to properly allocate certain expenses between income and principal; and (4) failing to adequately diversify the Trust's holdings. These issues also remained unresolved until 2007.

On June 15, 2006, the Trustees filed a Petition for Instructions Regarding Initial Funding of Subtrusts. The petition sought to establish and fund the subtrusts in accordance with the terms of the Revocable Trust. Kiana filed objections, primarily contesting the proposed funding of the subtrusts, proposed distributions, and allocations between principal and income. She also requested the appointment of a master to oversee the increasingly complex disputes. The subtrust issues, including those raised in the 1998-99 accounts, remained largely unresolved until 2007.

On August 29, 2006, the Trustees filed a Petition for Approval of Income and Principal Accounts for the Period January 1, 2004 through December 31, 2005. Kiana filed objections, arguing that the Trustees breached their fiduciary duties by: (1) providing incomplete accountings for both years; (2) failing to properly allocate expenses and sales proceeds between principal and income; (3) failing to make the trust assets productive; (4) failing to diversify; and (5) failing to distribute net income.

On March 30, 2007, the Trustees filed a Petition for Approval of Income and Principal Accounts for the Period January 1, 2006 through December 31, 2006. Kiana filed objections, alleging that the Trustees breached their fiduciary duties by: (1) failing to make trust assets productive; (2) failing to diversify the trust assets; (3) failing to properly allocate

proceeds and expenses between principal and income; and (4) failing to distribute net income.

2.    Marital Trust

The Marital Trust accountings and objections largely mirrored those in the Revocable Trust matter.  On March 30, 2006, the Trustees filed a Petition for Approval of Income and Principal Accounts for the Period July 15, 1997 through December 31, 2004 for the Marital Trust.  On June 29, 2006, the Trustees filed a Petition for Approval of Income and Principal Accounts for the Period January 1, 2005 through December 31, 2005.  On March 30, 2007, the Trustees filed a Petition for Approval of Income and Principal Accounts for the Period January 1, 2006 through December 31, 2006.  Kiana filed objections to all three petitions, asserting substantially the same allegations of breach of fiduciary duty as she had in the Revocable Trust matter.

B.    Initial Involvement of SNR

Because the terms of both the Revocable Trust and the Marital Trust directed that they be administered under California law, the Trustees engaged SNR, a California law firm, for guidance on various administrative issues.  In late 2004, First Hawaiian Bank initially sought SNR's advice on California trust law.  At that time, the Trustees were also represented by Hawai'i counsel, Carroll Taylor (**Taylor**).  In March of 2005, the Trustees also retained Keith Bartel (**Bartel**), a California trust lawyer, to assist in the Revocable Trust matter and provide expertise on California trust and estate law.  Bartel was later admitted *pro hac vice* in the Marital Trust matter as well.

In July of 2006, the Trustees decided to have SNR take a more active role in the proceedings.  SNR filed a notice of appearance in both the Revocable Trust and Marital Trust matters. In December of 2006, SNR began preparing a Request for a Private Letter Ruling (**PLR Request**) from the Internal Revenue Service on behalf of one of the subtrusts.

C.    2007 Trust Administration, Litigation, and Settlements

1.    Litigation and Discovery

On December 12, 2006, the Circuit Court set all outstanding issues in the Revocable Trust and Marital Trust matters for a concurrent bench trial to begin on November 27, 2007.    The trial was estimated to take twelve days.

Trial was set to encompass the following issues:    (1) approval of accounting petitions in the Revocable Trust for 1998-99, 2000-2003, 2004-2005, and 2006; (2) Kiana's objections to those accounts, including allocation of assets, income, distributions, and expenses, and the Trustees' alleged breaches of fiduciary duties; (3) initial and final funding of the subtrusts; (4) approval of accounting petitions in the Marital Trust for 1997-2004, 2005, and 2006; and (5) Kiana's objections to those accounts, including allocation of assets, income distribution, and expenses; and the Trustees' alleged breaches of fiduciary duty.    The issues for trial thus concerned a combined total of nineteen accounting periods, numerous alleged breaches of fiduciary duty, and the funding of various subtrusts.    Among the various beneficiaries, Kiana remained the sole objector to the accounting petitions before the court.    In early 2007, counsel for the Trustees and counsel for several other beneficiaries reportedly urged Kiana to withdraw her objections and avoid the substantial expense of litigation.    She declined to do so, as was her right.

In her pretrial statements, Kiana identified thirty lay witnesses and an unspecified number of expert witnesses to be called in both matters.    The Trustees listed eleven lay witnesses and seven expert witnesses.

Kiana served Requests for Production of Documents on the Trustees in each trust matter.    The Trustees asked SNR to coordinate the review of trustee files as well as responses to discovery requests.

In April of 2007, on behalf of the Trustees, SNR filed the PLR Request regarding the subtrust.  SNR had been primarily responsible for researching issues, drafting the request, and ensuring compliance with the applicable tax and filing statutes, rules, and regulations.

In May of 2007, the Trustees served numerous discovery requests on Kiana, including Requests for Interrogatories, Production of Documents, and Admissions.  SNR was primarily responsible for drafting and coordinating the discovery.

On June 21, 2007, the Trustees filed a Motion for Summary Adjudication of Issues.  The motion sought to adjudicate seven specific issues.  It was the first of several planned motions for partial summary judgment that the Trustees asked SNR to research and prepare.  The hearing on the motion was never held because the parties reached a partial settlement agreement in August of 2007 (discussed below).

In July of 2007, the parties had failed to reach a settlement following three-day mediation.  Discovery continued. The Trustees deposed Kiana, and Kiana deposed James Lawhn of First Hawaiian Bank.  SNR was primarily responsible for representing the Trustees in these depositions.

The Trustees and Kiana collectively noticed at least sixteen depositions, with Kiana requesting leave to depose more than ten witnesses.  Anticipating these numerous depositions, the Trustees sought the admission of SNR attorney Hank Zangwill (**Zangwill**) *pro hac vice*.  A member of SNR's insurance and litigation groups, Zangwill supervised discovery and was prepared to participate in the depositions.  Ultimately, however, Zangwill did not attend any depositions, as the parties only conducted two before reaching a settlement agreement.

2.    August Settlement Agreement

On August 20, 2007, the Trustees reached a partial settlement with Kiana (**August Settlement Agreement**). Kiana agreed to withdraw, with prejudice, all claims of breach of fiduciary duty against the Trustees. The Trustees agreed to withdraw their Motion for Summary Adjudication, to suspend all existing discovery requests and scheduled depositions, and to the appointment of a master to assist the beneficiaries with evaluating the issues and evidence.

Pursuant to the August Settlement Agreement, the Trustees filed an amended petition for instructions regarding the final funding of subtrusts and accountings. The Petition set forth the remaining issues for trial: (1) approval of the accounting petitions in the Revocable Trust from 1998-99, 2000-2003, 2004-2005, and 2006; (2) approval of the accounting petitions in the Marital Trust from 1997-2004, 2005, and 2006; and (3) final funding of the subtrusts.

3.    Trial and the December Settlement Agreement

At trial, the Trustees were represented in court by Taylor and Alan Yoshitake (**Yoshitake**), an SNR partner licensed in both Hawai'i and California. The Trustees sought to utilize Yoshitake's experience and expertise in California trust law, particularly in the cross-examination of one of Kiana's expert witnesses.[2/]

After six days of trial, the parties resumed settlement discussions. All parties entered a further settlement agreement on December 21, 2007 (**December Settlement Agreement**). The

───────────────

[2/]    In support of SNR's fees, Yoshitake attested that he had been practicing for over twenty-two years, holds an LLM in taxation, and is a certified specialist in estate planning, trust, and probate law. He attested that he is the head of SNR's west coast trusts and estates department and had "successfully chaired several trials and negotiated numerous settlements in adversarial trust and estate administrations."

9

Agreement dismissed Kiana's objections to all of the unresolved accounting petitions in the Revocable and Marital Trusts (through December 31, 2006). It also approved immediate distributions to each of the beneficiaries, totaling $60 million.

The Trustees requested all fees, costs, and distributions under the December Settlement Agreement to be paid by the end of 2007 in order to obtain a tax deduction for the trusts.

4. 2007 Attorneys' Fees

As reflected in the 2007 accountings, the trusts made the following disbursements for the attorneys' fees of the beneficiaries: $718,682 to Kiana's attorney;[3] $74,073 to beneficiary Corin Gentry-Balding's attorney; $60,177 to beneficiaries Norman Gentry, Mark Gentry, and Tania Gentry's attorney; $105,320 to the guardian ad litem for minor beneficiaries; $101,459 to the guardian ad litem for unborn and contingent beneficiaries; and $77,920 to beneficiaries Race and Arielle Gentry's attorney. Not all attorneys' fees disbursed in 2007 were for services performed in 2007.

The attorneys' fees distributed to the Trustees' lawyers in 2007 were as follows: $184,768 to Taylor; $99,370 to Bartel; and $1,051,293 to SNR. During that year, it appears that SNR had been solely or primarily responsible for the following: (1) drafting and coordinating nearly all discovery matters, including discovery requests, review of approximately nine years' worth of trustee records, scheduling matters, and meet and confers; (2) preparing for, conducting, and defending depositions; (3) preparing documents pertaining to mediation, including the mediation brief, the Trustees' response to the

_____

[3] Approximately $106,585 was paid from the Revocable Trust's principal and income assets, with the balance being paid from a distribution to Kiana.

mediator's report, and the initial draft of the settlement agreement; (4) preparing and filing the PLR Request with the IRS; (5) preparing and filing the petitions for approval of the 2006 accountings in both the Marital and Revocable Trusts; (6) preparing the petition for approval of final funding for the various subtrusts; and (7) serving as lead counsel at trial.

Collectively, the attorneys' fees and costs paid from the trusts to beneficiaries' counsel and guardians ad litem during 2007 totaled $1,137,631.  The fees and costs paid to the Trustees' counsel during that period totaled $1,335,430.

D.    2008 Trust Administration; Approval of Attorneys' Fees

On June 14, 2008, the Trustees filed petitions to approve the accountings in the Revocable and Marital Trusts for the period of January 1, 2007 through December 31, 2007, including payment of $1,051,293 to SNR in 2007 for attorneys' fees and costs.  The petitions did not include detailed supporting documents for the trusts' income and expenses, such as, with respect to the payments made to the trusts' attorneys, invoices or affidavits showing the services provided, hours worked, or rates charged.  A number of the beneficiaries filed objections, arguing that the Trustees failed to demonstrate the reasonableness of the attorneys' fees and seeking disclosure of SNR's billing invoices.

Following hearings held on July 30 and 31, 2008, the Circuit Court approved in part the 2007 accountings, but continued the issue of the Trustees' payment for the legal services provided SNR.  The Trustees objected to disclosure of the unredacted invoices, arguing that they contained privileged information.  They offered to provide redacted invoices, to provide a summary of the invoices, or to provide the invoices for *in camera* review.  The Circuit Court instructed the Trustees to submit the unredacted invoices to the court for *in camera* review.

11

The Circuit Court personally reviewed all of SNR's 2007 invoices, redacted them to remove privileged matters, and distributed the redacted invoices to the beneficiaries. It provided the beneficiaries an opportunity to review the invoices and file supplemental objections, followed by the Trustees' opportunity to respond. It also directed SNR to provide information regarding hourly rates of the various SNR timekeepers and requested it to provide comparable attorneys' rates from California or New York. The court stated that it would deem these supplemental pleadings to satisfy the requirements of the Hawaiʻi Probate Rules.

In early September, 2008, the Beneficiaries submitted their supplemental objections relating to the approval of the 2007 accounts with respect to SNR's fees, asserting that SNR's services did not benefit the trust and that retaining an expensive California law firm was not necessary. They also objected to specific time entries in the invoices contending: (1) no benefit to the trust; (2) reflected secretarial, administrative, and other non-legal work that should be categorized as overhead expenses; (3) constituted duplicate billing; (4) "double billing" for the same work involving multiple attorneys; (5) ambiguous or incomplete work descriptions; or (6) unreasonable time spent on particular tasks. They objected to costs for airfare travel, meals, messenger services, ground transportation, and conferencing services. They argued that the reasonableness of the fees should be governed exclusively by Hawaiʻi law, not California law. Finally, Kiana submitted hourly rates of the Beneficiaries' attorneys, which ranged from $140 to $350.

On October 3, 2008, the Trustees filed the requested information on hourly rates and a response to the Beneficiaries' supplemental objections, arguing that California law governed the administration of the trusts, including the reasonableness of

12

Trustees' retention of and payment to SNR.  They responded to the Beneficiaries' objections to specific time entries as follows: (1) the work done in defending the trust accountings, preparing the PLR Request, and advising First Hawaiian Bank on its insurance policy benefitted the trusts; (2) the alleged "clerical" work reflected "vital services related to discovery" that were legal in nature but were assigned to paralegals and litigation support because of their lower billing rates; (3) the alleged duplicate entries reflected work done in the two separate trust matters that was later consolidated into a single invoice; (4) the "double billing" reflected the unique contributions of multiple attorneys whose involvement was necessary for the work performed; (5) the invoices sufficiently described the work performed; and (6) the complexity and volume of the issues set for trial justified the number of hours spent on specific tasks. The Trustees argued that the travel costs reflected only those necessary for travel between Hawai'i and California and asserted that the messenger fees were incurred as the most cost-effective means of filing voluminous documents for the PLR Request. Finally, they argued that SNR attempted to keep fees low by delegating tasks to associates, paralegals, and other legal staff with lower billing rates, thus resulting in the high number of timekeepers.

The Trustees also filed hourly rates and credentials for the various timekeepers reflected in the invoices.  These rates ranged from $175 to $490.  They also provided the comparable rates of three attorneys in the California area with similar experience and background as Yoshitake, which ranged from $700 to $750 (far exceeding the rate charged by Yoshitake). Finally, Yoshitake submitted a declaration attesting that although his usual rate at the time was $495 per hour, he only billed $445 in the trust matters.

On February 27, 2009, after conducting an *in camera* review of the unredacted invoices and taking into consideration the extensive arguments of all parties, the Circuit Court entered orders and judgments in both trust matters approving SNR's attorneys' fees.[4] The court noted that its review was based in part on having reviewed each invoice. It concluded that the fees "were reasonable and necessary" and complied with "Hawaii and/or California law." The court found SNR's responses to the Beneficiaries' objections regarding billing issues to be credible. It found the timekeepers' hourly rates, as well as the time recorded in each billing entry, to be reasonable. It concluded that the "high quality of work" provided by SNR benefitted the trust, especially regarding California law. It found there was "no basis for reduction in fees, particularly when compared to the aggregate fees of Beneficiaries and the scope of litigation involving a decade of accounts as well as the ultimately settled claims against the Trustees."

The Beneficiaries filed timely notices of appeal and cross-appeal between March 25, 2009 and April 8, 2009.

II. POINTS OF ERROR

In their points of error on appeal, Appellants contend that the Circuit Court erred in: (1) failing to exclusively apply Hawai'i law in approving the attorneys' fees; (2) determining the reasonableness of SNR's rates based on comparable rates from California instead of Hawai'i; (3) approving the attorneys' fees because SNR's invoices contained improper block billing, double billing, ambiguous billing, billing for clerical and overhead services, and billing for services that provided little or no benefit to the trusts; and (4) approving SNR's

---

[4] Although denominated as an order approving SNRs' attorneys' fees, the Circuit Court's order was in fact approving the trusts' 2007 accounts with respect to trustees' payment of the attorneys' fees from the assets of trusts.

unsubstantiated costs for interstate travel, messenger services, and other miscellaneous expenses, contrary to Hawai'i law.

III.  STANDARD OF REVIEW

When reviewing a request for the approval of a trust's accounts, a court of equity is called upon to determine the propriety of each entry reflected in the accounts and may exercise its discretion in conjunction with such review.  In re Estate of Bishop, 53 Haw. 604, 605, 499 P.2d 670, 671 (1972). "The relief granted by a court in equity is discretionary and will not be overturned on review unless the circuit court abused its discretion by issuing a decision that clearly exceeds the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of the appellant." Aickin v. Ocean View Invs. Co., Inc., 84 Hawai'i 447, 453, 935 P.2d 992, 998 (1997) (citation, internal quotation marks, and brackets omitted).

IV.  DISCUSSION

A.    California Law Applies to the Trusts' Administration

First, we address the Beneficiaries' contention that Hawai'i law applies to the propriety of the Trustees' payment of SNR's attorneys' fees.  They argue that the Circuit Court erred in failing to exclusively apply Hawai'i law.[5/]  They maintain that because the fees were incurred in Hawai'i, the reasonableness of the fees must be construed according to Hawai'i law.  The Trustees have maintained that under the terms of the trusts, California law applies to trust administration, including the professional fees incurred by the trustees in conjunction with

---

[5/]    The Circuit Court found that the fees were reasonable under "Hawaii and/or California law."

their administration of the trusts.[6/] We agree that the terms of both trusts dictate the application of California law.

To determine which law applies, we look first to Hawai'i conflicts-of-law principles. See Restatement (Second) of Conflict of Laws § 8 (2010). The Uniform Probate Code, as enacted in Hawaii Revised Statutes (**HRS**) Chapter 560, governs choice-of-law provisions in trust instruments. See HRS § 560:2-703 (2006). It provides that the "*meaning and legal effect* of a governing instrument is determined by the local law of the state selected in the governing instrument[.]" Id. (emphasis added)[7/] However, it does not expressly provide for choice of law regarding the *administration* of trusts. See id.

However, a number of authorities agree that a settlor's choice of law regarding trust administration is enforceable. See Restatement (Second) of Conflict of Laws § 272; George Gleason Bogert, George Taylor Bogert & Amy Morris Hess, The Law of Trusts and Trustees § 297 (3d ed. 2011).[8/] A settlor may "freely regulate most matters of administration[,]" including which state law is to govern the administration of the trust. Restatement (Second) of Conflict of Laws § 272 cmt. c. The designated state does not need to have any connection with the trust itself. Id.; Bogert et al., The Law of Trusts and Trustees § 297 ("As to

---

[6/]    On appeal, the Trustees also argue that the rates were reasonable under both Hawai'i and California law, and the Circuit Court thus did not abuse its discretion regardless of which law applies.

[7/]    A "governing instrument" includes a trust. HRS § 560:1-201 (2006).

[8/]    This rule accords with HRS § 560:7-305 (2006), which provides that a settlor's designation of the place of administration is controlling "unless compliance would be contrary to efficient administration or the purposes of the trust." It also finds support from legislative history. In adopting the choice-of-law provision of the Uniform Probate Code, the legislature sought to follow its approach toward enforcing choice-of-law provisions except where contrary to public policy, such as preserving a spouse's elective share. Conf. Comm. Rep. No. 77 in 1996 House Journal, at 993, 1996 Senate Journal, at 775.

matters of trust administration, the settlor may designate the local law of a particular state to govern such matters even though that state has no connection with the trust.").

Here, both trust instruments contain substantially the same choice-of-law provision:

> This instrument shall be construed and *administered* in accordance with the laws of the State of California and the United States of America; and unless otherwise indicated all words and phrases used herein shall have the same meaning as they have in the California Probate and Civil Codes and the Internal Revenue Code.

(Emphasis added.) Both thus select California law to govern trust administration.

Matters of trust administration include the approval of annual accountings, including responding to beneficiaries' objections. See HRS § 560:7-303 (2006) (trust administration includes trustee's duty to inform and account to beneficiaries); Restatement (Second) of Conflict of Laws § 271 cmt. a; Restatement (Third) of Trusts §§ 76, 83 (2010); Bogert et al., The Law of Trusts and Trustees § 293 (trust administration concerns management of trust, including trustees' powers, duties, liabilities, and right to compensation and indemnity for expenses). The approval of the trustees' payment of SNR's fees pertains to trust administration, since the fees are part of the annual trust accountings. As a result, California law applies to the approval of accountings, including the attorneys' fees to be paid from the trust.

The Beneficiaries argue that Hawai'i law must apply because the attorneys' fees were incurred in Hawai'i-based litigation. However, where the fees were incurred is not determinative of which law governs the administration of the trusts. As the fees were incurred in the course of trust administration, California law regarding their compensability and reasonableness applies.

17

The Beneficiaries also argue that because SNR's attorneys were either licensed or admitted *pro hac vice* in Hawaiʻi, their rates are subject to regulation under the Hawaiʻi Rules of Professional Responsibility (**HRPR**). Although attorneys practicing law in Hawaiʻi are clearly subject to the disciplinary jurisdiction of the Hawaiʻi Supreme Court, this is not a disciplinary matter. The questions before this court concern the approval of the trusts' accounts for 2007, in particular the payment of attorneys' fees in the course of administering the trusts. The reasonableness of the attorneys' fees as a matter of trust administration is subject to California law.

Finally, the Beneficiaries maintain that the compensability of attorneys' fees is governed by HPR Rule 40(a) (1997), which provides:

> A fiduciary may pay fees for services of a fiduciary, attorney, or other professional that are not set by statute or court rule as long as the fees are just and reasonable in amount for the scope of services rendered. The reasonableness of the fees allowed shall be determined by all the facts and circumstances of the work performed including the complexity or ease of the matter, the experience, expertise, and uniqueness of services rendered, the amount of time spent on the matter, and the amount charged by others in similar situations.

The commentary to this rule notes that "professional fees, including those of an attorney, shall be compensated based on the types of services rendered." HPR Rule 40 cmt. Here, the Circuit Court clearly took into consideration the indicia of reasonableness set forth in the text and commentary to HPR Rule 40(a), as reflected in the court's February 27, 2009 orders.

B.  Application of California Law

Various provisions of the California Probate Code authorize trustees to obtain payment from the trust for their attorneys' fees. Trustees have the power to hire attorneys and other professionals "to advise or assist the trustee in the performance of administrative duties." Cal. Prob. Code § 16247

18

(West 2011).  They are entitled to pay "reasonable compensation" to employees and agents of the trust, and for other expenses incurred "in the collection, care, administration, and protection of the trust."  Id. at § 16243 (West 2011).  Finally, trustees are "entitled to the repayment out of the trust property" for "[e]xpenditures that were properly incurred in the administration of the trust."  Id. at § 15684 (West 1991).

Under California law, it is well-established that trustees are entitled to reasonable attorneys' fees and costs incurred in completing and defending trust accounts.  In re Hanson's Estate, 114 P. 810, 812 (Cal. 1911) ("It is well settled [that] . . .  a trustee has a right to employ attorneys, and to have an allowance in a reasonable amount made by the court from the trust funds for their compensation."); accord Kasperbauer v. Fairfield, 88 Cal. Rptr. 3d 494, 499 (Cal. Ct. App. 2009); Terry v. Conlan, 33 Cal. Rptr. 3d 603, 614-15 (Cal. Ct. App. 2005); In re Griffith's Estate, 218 P.2d 149, 153 (Cal. Dist. Ct. App. 1950) ("A trustee is entitled to employ counsel and be reimbursed from the funds of the trust for reasonable sums paid for the services of such counsel whenever it is necessary to the proper administration, preservation or execution of the trust."); In re Spencer's Estate, 63 P.2d 875, 876 (Cal. Dist. Ct. App. 1936). Preparing the accounts and responding to beneficiaries' objections "are aspects of trust administration."  Kasperbauer, 88 Cal. Rptr. 3d at 499.  Thus, reasonable attorneys' fees and costs may be paid from the trust.  Id.

Like Hawai'i, California law recognizes that trial courts possess "broad authority to determine the amount of a reasonable fee" for attorneys.  PLCM Grp., Inc. v. Drexler, 997 P.2d 511, 518 (Cal. 2000).  Trial courts possess their own expertise in determining the value of legal services and may make such a determination "contrary to, or without the necessity for,

expert testimony." Id. at 519 (internal quotation marks and citation omitted). This is because "[t]he experienced trial judge is the best judge of the value of professional services rendered in his [or her] court[.]" Ketchum v. Moses, 17 P.3d 735, 741 (Cal. 2001) (internal quotation marks and citation omitted). A trial court's fee determination "will not be disturbed unless the appellate court is convinced that it is clearly wrong." Id. (internal quotation marks and citation omitted); see also In re Duffill's Estate, 206 P. 42, 49 (Cal. 1922) (an appellate court may only overturn a lower court's fee determination if there is a "plain and palpable abuse of its discretion[.]"); accord Press v. Lucky Stores, Inc., 667 P.2d 704, 712 (Cal. 1983).

California courts have set forth a well-developed "lodestar" method for analyzing the reasonableness of attorneys' fees.[9] Ketchum, 17 P.3d at 743-44. The goal of this method is to arrive at an objectively reasonable amount reflecting the value of the attorneys' services. PLCM Grp., Inc., 997 P.2d at 518. The analysis is aimed at approximating the fair market value of the attorneys' services. Ketchum, 17 P.3d at 741.

The starting point for reasonable attorneys' fees is the "lodestar" -- the "hourly amount to which attorneys of like

---

[9]    The lodestar method originated in "common fund" and "private attorney general cases," such as class action suits, where a fee award is necessary to incentivize attorneys to take on such high-risk cases. See Serrano v. Unruh, 652 P.2d 985, 997-1000 (Cal. 1982); Serrano v. Priest, 569 P.2d 1303, 1306-17 (Cal. 1977). However, the California Supreme Court later clarified that the lodestar method is applicable to all statutory attorneys' fees unless the legislature clearly indicates otherwise. Ketchum, 17 P.3d at 743-44; see also Press, 667 P.2d at 710-11 (trial court's discretion "must be based on the lodestar adjustment method."); Donahue v. Donahue, 105 Cal. Rptr. 3d 723, 732 (Cal. Ct. App. 2010) (citing cases applying lodestar method for determining reasonableness of attorneys' fees in trust accounting); Komarova v. Nat'l Credit Acceptance, Inc., 95 Cal. Rptr. 3d 880, 898-99 (Cal. Ct. App. 2009) (discussing development of lodestar method as the only way of addressing a fee determination objectively). Because the payment of attorneys' fees from the trust is pursuant to statute (i.e., provisions of the California Probate Code), the lodestar method applies to determining their reasonableness.

skill in the area would typically be entitled" multiplied by the "number of hours reasonably expended." Id. at 742-43 (citations and quotation marks omitted). This analysis involves two steps: (1) determining the number of hours reasonably spent; and (2) determining a reasonable hourly rate. Id. We will address each step in turn.

1. Reasonable Time Spent, Generally

The first step involves determining the number of hours reasonably expended on the case. Ketchum, 17 P.3d at 742. The time spent should be "appropriate to the purposes and circumstances of the trust." Donahue, 105 Cal. Rptr. 3d at 729 (citations and internal quotation marks omitted). It should also reflect the difficulty of the case and complexity of the issues. Ketchum, 17 P.3d at 746. "Time is compensable if it was reasonably expended and is the type of work that would be billed to a client." MBNA Am. Bank, N.A. v. Gorman, 54 Cal. Rptr. 3d 724, 733 (Cal. App. Dep't Super. Ct. 2006) (citation omitted).

To determine the amount of hours reasonably expended, the trial court must review the supporting documentation offered in support of the fees. Donahue, 105 Cal. Rptr. 3d at 731-32. The party seeking fees is not necessarily required to submit contemporaneous daily billing records or invoices.[10/] See PLCM

---

[10/]    The Beneficiaries argue that the Trustees' submission of invoices did not comply with HPR Rules 26 (2006) and 41 (1997), which govern the form and content of a petition for accounting and for approval of attorneys' fees. Rule 26 requires "a detailed accounting of the transactions of the trust or estate during the accounting period[.]" However, the commentary clarifies that the rule "does not mandate any form of detailed accounting, leaving that to the fiduciary's discretion."

Rule 41 sets forth evidentiary requirements for attorneys' fees. It provides, in relevant part:

> Whenever there is an objection to the fees of a fiduciary or attorney, or court approval of such fees is sought for any reason, the fiduciary or attorney whose fees are at issue shall file an affidavit, setting forth the amount and basis
> (continued...)

Grp., Inc., 997 P.2d at 519 (upholding fee determination based on detailed reconstruction of time spent where law firm did not keep contemporaneous billing records); Chavez v. Netflix, Inc., 75 Cal. Rptr. 3d 413, 432 (Cal. Ct. App. 2008) ("[D]etailed time sheets are not required" in fee determinations for class action cases, applying lodestar method); Margolin v. Reg'l Planning Comm'n, 185 Cal. Rptr. 145, 149 (Cal. Ct. App. 1982) (upholding fee determination based on counsel's estimates for portion of time spent). The supporting documentation should be sufficient to "allow the court to consider whether the case was overstaffed, how much time the attorneys spent on particular claims, and whether the hours were reasonably expended." Donahue, 105 Cal. Rptr. 3d at 732. (citations and internal quotation marks omitted). The trial court must review such documentation to eliminate "padding in the form of inefficient or duplicative efforts[.]" Ketchum, 17 P.3d at 741 (citation and internal quotation marks omitted).

Several cases help shed light on this step of the lodestar analysis. In Duffill's Estate, for example, the California Supreme Court upheld attorneys' fees of $75,000 for a trust worth just over $1 million. 206 P. at 47-49. It examined

---

10/ (...continued)
          of calculation of the fees sought and any costs advanced
          which are to be reimbursed, at the same time as any petition
          seeking approval of such fees or any response to a petition
          objecting to such fees. The affidavit should specifically
          detail the charges for the services and costs rendered to
          the date of the affidavit and the anticipated charges and
          costs to complete the matter through preparation,
          processing, and service of the order.

The initial petition for the 2007 accounting set forth the total fees and included an affidavit attesting to the accuracy of the accounting. Following the Beneficiaries' objections, the Circuit Court requested all parties to submit supplemental pleadings. It stated that it would deem the signed pleadings to satisfy the requirements of the HPR. Although the Beneficiaries previously objected to the approval of the attorneys' fees in part because of the lack of an affidavit, they did not object to this determination.

"[t]he nature of the litigation, its difficulty, the amount involved, the attention given, and the success or failure of the attorney's efforts."  Id. at 47 (citation and internal quotation marks, brackets, and ellipses omitted).  It concluded that although the amount of the fee "impresses us as large -- larger, perhaps, than we would have named[,]" the lower court was within its discretion.  Id. at 49.  The record itself furnished evidence of the services performed, and other attorneys testified that for a trust of its size, a ten to fifteen percent fee was not unreasonable.  Id. at 48-49.  Thus there was no "plain and palpable" abuse of discretion.  Id. at 49.

Here, as discussed in more detail below, it is clear from the record that the Circuit Court assessed each of these factors.  Although a substantial amount, the total fees incurred by SNR were less than 2% of the total distribution resulting from the December Settlement Agreement.[11/]  The Circuit Court clearly considered SNR's work toward achieving this result of significant benefit to the trust beneficiaries.

A recent California case provides additional guidance. Donahue, 105 Cal. Rptr. 3d 723.  There, the trust beneficiary challenged the trustee's petition for more than $5 million in attorneys' fees incurred while defending a final accounting that involved allegations of breach of trust.  Id. at 726.  The trustee had been represented by multiple attorneys from three large firms.  Id. at 726-27.  Several billed at rates as high as $690 per hour.  Id. at 726.  One attorney alone billed more than $1.5 million during his involvement.  Id.

Upon review, the California appellate court set forth a

---

[11/]    Other cases have upheld attorneys' fees of similar or greater percentages.  See, e.g., Bixby v. Hotchkis, 136 P.2d 597, 599-602 (Cal. Dist. Ct. App. 1943) (approving attorneys' fees of $22,000 from trust worth about $750,000; or 2.9%).

number of factors for the trial court to consider. First, it must engage in careful review of the supporting documentation to avoid an overly deferential approach. Id. at 731-32. The court should consider "whether the case was overstaffed, how much time the attorneys spent on particular claims, and whether the hours were reasonably expended." Id. at 732 (citations and internal quotation marks omitted). It must exclude compensation for "padding in the form of inefficient or duplicative efforts." Id. (citations and internal quotation marks omitted). It must consider whether the fees incurred are "proportional to the trust's objectives." Id. at 734. Finally, it must determine whether the fees were "reasonably incurred *for the benefit of the trust.*" Id. at 735 (emphasis in original). The overarching standard is based upon the time spent and the "reasonable value of that time[.]" Id. at 732 (citation and internal quotation marks omitted).

Here, the Circuit Court explained its basis for the fee award. It found credible SNR's explanations for the reasonableness and necessity of the fees. The Circuit Court personally reviewed and redacted each page in the voluminous invoices. The Circuit Court allowed all parties to file additional pleadings, and it considered the comparable rates of similar attorneys, as well as the itemized objections of the Beneficiaries. The amount of time spent by SNR is not patently unreasonable in proportion to the trusts' objectives and the scope of the work undertaken by SNR. There is no indication that the Circuit Court merely rubber-stamped the Trustees' approval of the fees request. To the contrary, it engaged in a comprehensive, detailed, and thoughtful review of the time entries that is well-supported by the record.

The Circuit Court also took into account each of the factors set forth in Donahue. It carefully considered and rejected the Beneficiaries' claims that the Trustees had overstaffed the case, that the amount of time spent was unreasonable, and that the invoices were padded. 105 Cal. Rptr. 3d at 732. The Circuit Court's determination is thus in accord with California law.

2. Specific Challenges to Invoices

The Beneficiaries raise a number of specific objections to the time billed by SNR, which we have carefully reviewed. The majority of these challenges concern the sufficiency of the invoices.[12/] The Beneficiaries argue that the invoices contain improper block billing, duplicate entries and double billing, vague and ambiguous descriptions, improper billing for administrative work, excessive hours, and improper costs. They appear to assert that because the invoices are deficient in these respects, they cannot support the Circuit Court's determination that the fees were reasonable.

Detailed invoices are not required to support a fee determination so long as there is sufficient documentary evidence

---

[12/] The Beneficiaries also assert that the Circuit Court imposed the wrong burden of proof by telling the Beneficiaries at a hearing that they failed to prove the requested fees were unreasonable. They cite solely Hawai'i law in support of this point. Under California law, however, the burden is less clear. See Premier Med. Mgmt. Sys., Inc. v. Cal. Ins. Guar. Ass'n, 77 Cal. Rptr. 3d 695, 706 (Cal. Ct. App. 2008) ("In challenging attorney fees as excessive because too many hours of work are claimed, it is the burden of the challenging party to point to the specific items challenged, with a sufficient argument and citations to the evidence.").

In any event, taken in context, the Circuit Court does not appear to have been espousing any particular burden of proof. It merely remarked that after performing a partial in camera inspection of the invoices, it "does not find that unreasonableness has been proven but will look forward to briefs that would be informed by the invoices and supplemental pleading to be filed about rates, et cetera." It further stated that it declined to make a final judgment at that time but would continue to review additional briefs and pleadings. In its orders approving the SNR fees expenditures, it affirmatively concluded that the fees were reasonable and necessary.

25

on which the court may base its conclusion. <u>PLCM Grp., Inc.</u>, 997 P.2d at 519. Thus a challenge to the documentation in support of attorneys' fees is essentially an insufficiency of the evidence claim. <u>Margolin</u>, 185 Cal. Rptr. at 149. "The problem then becomes one of fact finding." <u>Id.</u> So long as substantial evidence supports the Circuit Court's findings, they will not be disturbed on appeal. <u>Id.</u> (holding that trial court's determination was supported by ample evidence in form of contemporaneous billing records); <u>accord</u> <u>Bhakta v. Cnty. of Maui</u>, 109 Hawaiʻi 198, 208, 124 P.3d 943, 953 (2005).

Moreover, where counsel submits contemporaneous time statements, such records are "the starting point" for the court's fee determination and "are entitled to credence in the absence of a clear indication the records are erroneous." <u>Horsford v. Bd. of Trs. of Cal. State Univ.</u>, 33 Cal. Rptr. 3d 644, 673-74 (Cal. Ct. App. 2005) (holding that trial court erred in disregarding attorneys' verified time records). A trial court acts well within its discretion in weighing the credibility of counsel's submissions regarding fees. <u>Bernardi v. Cnty. of Monterey</u>, 84 Cal. Rptr. 3d 754, 769 (Cal. Ct. App. 2008). This is particularly true where, as here, the trial court is "familiar with the quality of the services performed and the amount of time devoted to the case." <u>PLCM Grp., Inc.</u>, 997 P.2d at 519.

The Beneficiaries' arguments are similar to those offered in <u>Margolin</u>. There, the appellants argued that the attorneys' fees were based on inadequate time records. 185 Cal. Rptr. at 149. The attorneys' supporting documentation provided only estimates for some of the hours worked. <u>Id.</u> On appeal, the court treated the appellants' arguments as an insufficiency of the evidence claim. <u>Id.</u> It concluded that contemporaneous time records supported most of the hours awarded, providing substantial evidence in support of the trial court's findings.

26

Id. It upheld the trial court's determination that the estimated hours were reasonable. Id.

Similarly, the California Supreme Court upheld a fee award where the attorneys did *not* keep contemporaneous billing records, but merely submitted a detailed reconstruction of the time spent on specific legal tasks. PLCM Grp., Inc., 997 P.2d at 519, incl. n.4. It cautioned trial courts against becoming "enmeshed in a meticulous analysis of every detailed facet of the professional representation." Id. at 520 (citation and internal quotation marks omitted). The analysis of attorneys' fees should not become so extensive as to "dwarf[] the case in chief." Id. (citation and internal quotation marks omitted). See also In re Marriage of Green, 7 Cal. Rptr. 2d 872, 877 (Cal. Ct. App. 1992) (holding that attorney declarations and itemized bills constituted sufficient evidence to support fee award, even though award did not provide mathematical breakdown of particular fees awarded); Ketchum, 17 P.3d at 747 (upholding fee determination where trial court reviewed extensive documentation regarding reasonableness of rate).

Finally, a California Court of Appeal upheld a fee award where the opposing party failed to provide any evidence to contradict the fees claimed. Premier Med. Mgmt. Sys., Inc., 77 Cal. Rptr. 3d at 702. As in this case, the appellants argued that the fee award was based on excessive hours and duplication of effort. Id. at 701-04. The court on appeal noted that the appellants failed to proffer evidentiary support for these allegations by either (1) providing evidence that fees claimed in the itemized billings were not appropriate, or (2) obtaining declarations from experienced attorneys to demonstrate that the fees were unreasonable. Id. at 706. The appellate court had "no evidentiary basis to second guess the conclusion of the trial court" that the fees were not unreasonable or duplicative. Id.

at 704.  It refused to determine that the hours claimed were unreasonable "as a matter of law[.]"  Id. at 703.

Here, likewise, the Beneficiaries have adduced no evidence in support of their arguments.  Aside from their proffer of comparable Hawai'i rates, which the Circuit Court considered, they did not offer any declarations or other evidence in support of their challenge to the hours spent.  Essentially, they argue that the fees are unreasonable as a matter of law due to improper billing practices.  Such an argument is unsustainable in light of Premier.  Id.

Nonetheless, we will address each of the Beneficiaries' objections in turn.

The Beneficiaries argue that SNR should not be compensated from the trust for "block-billed" entries, or those where multiple tasks are lumped in a single time entry.  However, the case they cite in support of this argument is distinguishable.  It merely illustrates that block billing is problematic where certain tasks are compensable but others are not.  Haw. Ventures, LLC v. Otaka, Inc., 116 Hawai'i 465, 476-77, 173 P.3d 1122, 1133-34 (2007) (block billing rendered it impossible to separate work in scope of receiver's duties, which was compensable, from work performed in defense of receiver's fees, which was not).  In such cases, block-billed entries render it impossible to apportion fees between tasks that are compensable and those that are not.  Id.  Here, no delineation is strictly necessary, as all of the tasks concerned compensable services performed in the administration of the trust.

The Beneficiaries argue that SNR should not be compensated for entries with vague and insufficient descriptions of work performed.  They argue that entries notating only "discovery," "review discovery issues," and "draft discovery" are insufficient to support SNR's fee request.  However, the record

reveals the extensive discovery issues involved in this case. The litigation involved nearly twenty years of combined accountings for trusts which, by the end of 2006, were estimated to be worth over $100 million and involved extensive and complex holdings.  The parties exchanged numerous discovery requests and filed notices for sixteen depositions.  The Trustees submitted a declaration attesting that SNR was primarily responsible for handling these requests and coordinating discovery.  The Circuit Court presided over the discovery and was familiar with the tasks involved.  It thus did not abuse its discretion in approving compensation for those entries.

The Beneficiaries argue that SNR "double- and triple-billed the trusts for inter-office conferences and team project pleadings."  They challenge entries for conference calls, meetings, correspondence, and other work involving multiple attorneys.  SNR explained that the meetings and discussions required coordinating issues and tasks delegated to multiple timekeepers in an effort to keep hourly rates low.  The participation of multiple timekeepers was necessary for coordinating strategy and analysis.  Moreover, each attorney "provided unique contributions to the issues discussed at the meetings," as the various timekeepers served independent roles and were responsible for "different issues, perspectives, and tasks."  SNR asserted that each timekeeper's involvement was "reasonable and necessary for the effective and efficient representation of [the Trustees]."  The Circuit Court found this explanation credible and concluded that the high quality of SNR's work benefitted the trust.

The Beneficiaries also argue that SNR submitted duplicate time entries, billing both trusts for the same block of time.  SNR explained that these entries were originally split

between the Marital and Revocable trusts in accordance with the time spent on each matter.  However, SNR later recombined the separate billings from the Revocable and Marital Trusts into a unified billing format for purposes of payment.  This consolidated invoice reflected identical entries for time spent on the Revocable and Marital Trust matters, respectively.  The Circuit Court found SNR's explanation credible and thus rejected the allegation of impermissible duplicate billing.  We cannot conclude that Circuit Court abused its discretion in this consideration of the parties' conflicting views in this regard.

The Beneficiaries argue that SNR should not be compensated for time entries that reflect clerical and administrative duties.  They argue these entries reflect overhead expenses that should be included in the attorneys' hourly rates. The challenged entries indicate such services as coordinating filings, transmitting discovery documents, creating deadline calendars, and finalizing data for production.  SNR explained that these services were vital to discovery and were legal, not administrative, in nature.  Although the tasks were appropriate for associate attorneys, in order to keep costs low, SNR delegated some of these tasks to paralegals and litigation support staff.  The Circuit Court found this explanation credible and the services to be beneficial.

The Beneficiaries argue that the invoices reflect an excessive amount of time spent on the trust matters.  They contend that SNR was not justified in billing almost $1.1 million to prepare for depositions that never took place, a motion for summary adjudication that was never heard, and a trial that lasted only six days.

This argument mischaracterizes the nature and extent of the services SNR rendered in 2007, as is evident from the record. In early 2007, both the Trustees and counsel for several other

beneficiaries advised Kiana that her continued objections to the unresolved accounting issues would result in substantial litigation costs.  She declined to retract her objections.  The parties thus undertook extensive discovery in anticipation of a lengthy trial concerning nearly twenty combined years of trust accounts.  Many of the depositions, as well as the hearing on the motion for summary adjudication, were ultimately cancelled due to the August Settlement Agreement.  In late 2007, the trial was already ongoing, but cut short when the parties entered the December Settlement Agreement, disposing of the remaining issues in dispute.  Yet by that time, the year was nearly complete, and SNR had already performed a significant amount of work in anticipation of the full trial.  Arguably, it would have been imprudent for the Trustees and SNR not to have fully prepared for the events that were discontinued due to the settlements.

In addition to the litigation of the prior accounts, SNR also took the lead in preparing and filing petitions for the 2006 accounts for both trusts, preparing the petition for approval of funding for various subtrusts, and preparing and filing the PLR Request to the IRS.  The Circuit Court, having presided over the 2007 proceedings, found the fees to be reasonable and necessary in light of the substantial work performed.

The Beneficiaries also argue that billing approximately 333 hours to prepare a motion for summary adjudication is patently excessive.  They point out that the motion only cited six cases and assert that it merely re-used "factual allegations from prior pleadings."  However, the Beneficiaries provided no evidence in support of their argument that the amount of time spent is excessive.  Instead, they essentially argue that the time billed is excessive as a matter of law.  Such an argument is unavailing.  See Premier Med. Mgmt. Sys., Inc., 77 Cal. Rptr. 3d

31

at 703-04 (rejecting argument that 345 hours billed for single motion was excessive as a matter of law; trial court was within its discretion in approving hours as reasonable).

Moreover, the motion concerned several important issues stemming from a lengthy and procedurally complex trust history. It included a declaration from Vorsatz setting forth the detailed history of the trust administration. Though the motion itself only involved only seven issues, its preparation required sorting through the numerous outstanding issues. Twelve discrete issues remained unresolved from the 1998-99 Revocable Trust accounting alone. To prepare the motion, SNR reviewed and evaluated the issues for each of the nine accounting periods before the Circuit Court. Given the complexity of the underlying litigation, the Circuit Court acted within its discretion when it found the hours spent to be reasonable.

The Beneficiaries also challenge the costs for interstate travel and messenger services. They argue that, under Hawai'i law, (1) such requests must be accompanied by receipts or documentation; and (2) costs for interstate travel and messenger services are not compensable. However, the cases they cite in support of the first proposition are inapposite. The first case, Rapozo v. Better Hearing of Hawaii, LLC, 120 Hawai'i 257, 264, 204 P.3d 476, 483 (2009), denied a request for copying costs because the petitioner failed to comply with Hawai'i Rules of Appellate Procedure (**HRAP**) Rule 39(d)(1), which specifically requires "an itemized and verified bill" of such expenses. The second case similarly concerned the taxation of costs under HRAP Rule 39(c)(5). Tortorello v. Tortorello, 113 Hawai'i 432, 444, 153 P.3d 1117, 1129 (2007) (denying requested costs because they were unsubstantiated). Those rules are not strictly applicable to the Trustees' ability to recover costs incurred in trust administration -- an issue governed by California trust law.

32

For their second argument on this point, the Beneficiaries rely on HRS § 607-9 (1993), regarding the taxation of costs, and various Hawai'i cases interpreting that provision.[13/] As noted above, such detailed documentation is not necessary to support a request for approval of reasonable attorneys' fees and costs in a trust accounting. PLCM Grp., Inc., 997 P.2d at 519. HRS § 607-9 and related Hawai'i cases thus do not apply to the approval of the trusts' accounts here.

We note that SNR represented that it was careful to avoid unnecessary travel expense. Yoshitake attended hearings by teleconference whenever possible. Where travel was necessary, Yoshitake scheduled multiple meetings and hearings for the same trip to maximize the benefit to the trust. The Circuit Court found this explanation credible and determined the fees and costs to be reasonable and necessary.

The Beneficiaries also challenge the costs billed for messenger services and FedEx charges. SNR submitted that these services were a necessary expense incurred in filing the PLR Request with the IRS and retrieving trust documents from First Hawaiian Bank for purposes of discovery. SNR utilized FedEx in filing the PLR Request "to ensure delivery of a complex technical document" to Washington, D.C. In responding to Kiana's discovery requests, SNR was required to review "over a hundred thousand pages of documents" from First Hawaiian Bank. It determined that shipping the documents would be more cost-effective than sending

---

[13/]    HRS § 607-9 provides, in relevant part:

> All actual disbursements, including but not limited to, intrastate travel expenses for witnesses and counsel, expenses for deposition transcript originals and copies, and other incidental expenses, including copying costs, intrastate long distance telephone charges, and postage, sworn to by an attorney or a party, and deemed reasonable by the court, may be allowed in taxation of costs.

attorneys and paralegals to Hawai'i to review the documents. The Circuit Court found these explanations credible and determined the costs incurred to be reasonable and necessary.

Finally, the Beneficiaries argue that SNR's services were performed solely for First Hawaiian Bank and did not benefit the trusts. They also challenge the trustees' need to hire SNR in the first place, arguing that the retention of a "mainland law firm" was not necessary or prudent. The record amply supports both the need for SNR's services and their benefit to the trust. The trust administration involved complex issues requiring the application of California law. Kiana retained an expert on California law as a witness at trial. The Circuit Court encouraged both parties to fully brief and research California law. In approving the fees, it found that SNR's "knowledge of California law was essential to the trust[s] and this litigation."

The lead SNR attorney possessed extensive experience and expertise in complex trust administration involving California law. SNR performed substantial work for both Trustees in their joint administration of the trust. It prepared and coordinated discovery matters, prepared various filings essential to the administration of the trust, and served as lead counsel at trial.

Because much of the work involved preparing and defending the trusts accounts, the fees were incurred for the benefit of the trusts. Kasperbauer, 88 Cal. Rptr. 3d at 499; In re Estate of Trynin, 782 P.2d 232, 235 (Cal. 1989).[14/] The

---

[14/] A line of California cases holds that attorneys' fees are not compensable where the trustees merely defend their *own* interests or those of certain beneficiaries over others. See, e.g., In re Gartenlaub's Estate, 198 P. 209, 211 (Cal. 1921); Terry, 33 Cal. Rptr. 3d at 614-15; Whittlesey v. Aiello, 128 Cal. Rptr. 2d 742, 746 (Cal. Ct. App. 2002); In re Estate of Gump, 2 Cal. Rptr. 2d 269, 283 (Cal. Ct. App. 1991). For example, a trustee is not
(continued...)

Circuit Court specifically found that SNR's "high quality of work benefitted the trust[s], whether in connection with this litigation or insurance coverage or other administrative matters."

In sum, the Trustees provided explanations refuting each of the Beneficiaries' objections. The Circuit Court found these explanations credible and persuasive. In determining the reasonableness of the fees, the Circuit Court was intimately familiar with the extensive scope of litigation, the complexity of the issues, and the specialized knowledge involved in this case. The same judge who ruled on the attorneys' fees also presided over the 2007 litigation which gave rise to the majority of the attorneys' fees and costs at issue. Judge Hifo had personal knowledge of the litigated matters and the facts relevant to the fee issue. She personally reviewed and redacted each of SNR's time records.

Given the supporting documentation provided by SNR and the Circuit Court's familiarity with the litigation and in-depth review of the invoices, we conclude that the Circuit Court did not abuse its discretion in approving SNR's fees.

3. Reasonable Hourly Rate

The Beneficiaries also argue that the Circuit Court erred in approving SNR's hourly rates. Specifically, they

---

[14] (...continued)
entitled to recover attorneys' fees where a court has determined that the trustee breached the trust. Estate of Gump, 2 Cal. Rptr. 2d at 283. Nor was a trustee entitled to recover fees where she sought to establish her interests as a beneficiary concerning the validity of one trust over another. Terry, 33 Cal. Rptr. 3d at 615. Here, by contrast, Kiana's breach-of-trust allegations were never ruled upon, as they were dismissed pursuant to the August Settlement Agreement. Nor were the Trustees in the sort of dual trustee-beneficiary role that often masks a defense of their own interests. As in Kasperbauer, the defense of the trust accountings was a necessary part of trust administration and was therefore beneficial to the trust. 88 Cal. Rptr. 3d at 499.

maintain that the court erred by: (1) refusing to consider comparable Hawai'i rates; and (2) failing to consider comparable rates for each of the SNR timekeepers reflected in the invoices.

An award of attorneys' fees must generally be based on the reasonable hourly rate prevailing in the local community for similar legal work. Envtl. Prot. Info. Ctr. v. Cal. Dep't of Forestry and Fire Prot., 118 Cal. Rptr. 3d 352, 377 (Cal. Ct. App. 2010). In general, the court should consider the market rate in the "community where the services are rendered, i.e., where the court is located." MBNA Am. Bank, N.A., 54 Cal. Rptr. 3d at 733 (citation omitted). However, in some circumstances, the court may consider higher rates of out-of-town counsel. Envtl. Prot. Info. Ctr., 118 Cal. Rptr. 3d at 377 (citation omitted). For example, where no local counsel could take a case because it required specialized knowledge, a trial court acted within its discretion in basing the reasonable rate on that of out-of-town counsel. Id.; accord Horsford, 33 Cal. Rptr. 3d at 675 (where party made good faith effort but could not retain local counsel, court could base fees on higher hourly rates of out-of-town counsel).

Here, special circumstances justified taking California rates into account. California law was at the crux of the trust accountings. An expert on California law testified for Kiana at trial. The lead SNR attorney possessed the requisite expertise in complex trust administration under California law. The Circuit Court expressly found that such "knowledge of California law was essential to the trust and this litigation" and that SNR provided a "high quality of work." Thus the court did not err in taking into account California rates, as special circumstances justified retaining California counsel.

In any event, the Circuit Court did consider comparable Hawai'i rates. Kiana submitted comparable hourly rates for seven

36

Hawai'i attorneys, ranging from $140 to $350. Yoshitake also submitted a declaration attesting that he charged a lower hourly rate in this case because one of the trustees was a Hawai'i client. The Circuit Court reviewed the comparables and found that SNR's hourly rates were reasonable.

The Beneficiaries also maintain that the Circuit Court erred in failing to request and consider comparable rates for each of the SNR timekeepers. SNR provided descriptions of each timekeeper's credentials, but only submitted comparable rates for Yoshitake, the lead SNR attorney. However, as with determining the reasonable time spent, in considering a reasonable hourly rate, the court is entitled to rely on its own expertise. PLCM Grp., Inc., 997 P.2d at 519. Expert witnesses or additional evidence are not required. Id.

Moreover, the record indicates that the Circuit Court considered all factors relevant to determining a reasonable hourly rate. These factors include the level of skill required, time limitations, the amount involved in the litigation, the attorney's reputation and experience, the quality of the representation, the attorney's success or failure in the outcome, and the "undesirability" of the case. Ketchum, 17 P.3d at 746; PLCM Grp., Inc., 997 P.2d at 519. The aim of such an analysis is to approximate the fair market value of the attorneys' services. Margolin, 185 Cal. Rptr. at 147.

Here, the case required a high level of skill and expertise in California law. It involved complex issues regarding the administration of two trusts, together worth over $100 million. SNR, and Yoshitake in particular, possessed a high level of experience and expertise as well as a strong reputation in trust administration. The other timekeepers billed their time at lower rates, which the Circuit Court viewed as reasonable in light of the comparable rates submitted by the parties. The

Circuit Court found that SNR achieved a favorable outcome in reaching the settlements and that its "high quality of work" benefitted the trusts.  It thus did not abuse its discretion in determining the hourly rates to be reasonable.

V.    CONCLUSION

Based on the foregoing discussion, we conclude that the Circuit Court did not err in approving the trusts' 2007 accounts, in particular, the trustees' payment of SNR's attorneys' fees. We affirm the Circuit Court's Judgments entered on February 27, 2009, in the Revocable and Marital Trust matters.

DATED:  Honolulu, Hawai'i, January 31, 2013.

On the briefs:

Peter Van Name Esser
and Margery S. Bronster
Jae B. Park
(Bronster Hoshibata)
for Respondent-Appellant
Kiana Gentry

Carol Lee M.I. Chin
for Respondents/Cross-Appellants
Norman Hal Gentry, Tania V.
Gentry and Mark T. Gentry

Scott A. Makuakane
for Respondent/Cross-Appellant
Guardian Ad Litem for Unborn,
Contingent Beneficiaries and
Cross-Appellant

Carroll S. Taylor
(Taylor Leong & Chee)
for Petitioners-Appellees
Mark L. Vorsatz and First
Hawaiian Bank as Co-Trustees

Alan T. Yoshitake
(Seyfarth Shaw LLP)
for Plaintiff-Appellee
First Hawaiian Bank as Co-Trustee

Presiding Judge

Associate Judge

Acting Associate Judge